IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN BOLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 10 CV 630 |
| v. | ) |
| | ) Magistrate Judge Michael T. Mason |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Steven Boland ("claimant" or "Boland") has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner denied claimant's request for Disability Insurance Benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ").  We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, claimant's motion for summary judgment [17] is granted in part and denied in part, and the Commissioner's motion for summary judgment [30] is denied.

## I.    BACKGROUND

### A.    Procedural History

Boland filed an application for Social Security Disability Insurance Benefits ("DIB") on February 16, 2007.  (R. 30.)  His application was denied initially on June 13, 2007, and after reconsideration on October 5, 2007.  (R. 42-44, 52-54.)  Boland

requested a hearing, which was held on April 15, 2009, before an ALJ.  (R. 12-29.)  The ALJ issued an unfavorable decision on May 14, 2009.  (R. 32-41.)  The Appeals Council denied claimant's request to review the ALJ's decision (R. 3-7), making the ALJ's decision the final decision of the Commissioner.  *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998).  Claimant then filed this timely appeal in the District Court, and the parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).

### B.    Medical Evidence

Claimant most recently worked as a ramp serviceman (also known as a baggage handler) for United Airlines.  (R. 17.)  As a part of that job, he unloaded cargo and luggage from planes when they arrived at their destination.  (R. 17-18.)  This required him to enter the cargo area of a plane and to throw the bags onto a conveyor belt that moved the bags from the plane to the tarmac.  (R. 18.)   On August 8, 2003, claimant was unloading a Boeing 757 aircraft.  (*Id.*)  As per his usual method of unloading a plane, he lifted "a very normal heavy bag" and threw it at the conveyor belt.  (*Id.*)  When he threw the bag, he "felt a crunch" and "froze."  (*Id.*)  After he "waited for about a minute," claimant resumed working and finished unloading the plane because "there's only a few bags left" and "[baggage handlers] do get hurt out there a lot."  (*Id.*)  After finishing his shift, claimant went home.  (*Id.*)  The next day he could not walk and did not go to work.  (*Id.*)  He has not worked since the date of this incident.  (*Id.*)

Over the seven to nine days following the incident, claimant had difficulty standing and crawled to move around his home.  (R. 186.)  On August 28, 2003, he

began physical therapy with Debbie Ebright, M.H.S., P.T.[1]  (R. 186-87.)  Ms. Ebright's

initial notes on that date state that claimant "reports of a constant pain in his lower back

which becomes sharp with sitting or bending too quickly.  His symptoms are increased

with sitting less than 5 minutes, standing, bending, driving, or climbing stairs....  He

presently rates his symptoms as 6 on a 0-10 scale with 10 being severe."  (R. 186.)  Her

notes also indicate that Boland was taking Vicodin and Naprosyn, and that his goal "is

to get better."  (*Id.*)

On September 8, 2003, claimant saw Barbara Heller, a doctor of osteopathy at

the DuPage Medical Group in Wheaton, Illinois.  (R. 175.)  Dr. Heller diagnosed

claimant by MRI with right L5 radiculitis on the basis of disc herniation at the L4-L5

vertebrae.  (*Id.*)  She also observed weakness and pain in his right buttock and leg.

(*Id.*)  She noted that claimant "is not working, because of his pain, which is significant,"

and wrote that he "will remain off work at this time."  (*Id.*)  Dr. Heller gave claimant a

series of three epidural injections near his spine, on September 10, September 17, and

September 24 of 2003.  (R. 167-69.)

Claimant continued physical therapy at least until October 7, 2003.  (R. 185.) On

that date, Besty Boyd,[2] P.T., observed, that despite twelve physical therapy sessions

and the epidural injections, Boland reported he had no significant relief of his symptoms,

and that recently he had been experiencing an increased tingling throughout his right

lower extremities.  (R. 185.)  Ms. Boyd wrote that "[t]he plan is to discharge him from PT

---

[1]  The name of Ms. Ebright's clinic is not clear from the record.

[2]  The name of Ms. Boyd's clinic is also not clear from the record but appears to be the same
clinic as Ms. Ebright's.

while he is undergoing further medical management." (*Id.*)

In December 2003, claimant saw Eldin Karaikovic, M.D., Ph.D., a surgeon in the Department of Orthopaedic Surgery at Evanston Northwestern Healthcare. (R. 183-84.) In a letter dated December 9, 2003, Dr. Karaikovic noted Boland's reports of painful ambulation and sleep limited to two hours due to pain, reviewed a MRI of claimant's lumbar spine, assessed Boland with L4-L5 herniated nucleus pulposus, and recommended a "partial diskectomy at the L4-L5 level." (R. 184.) He noted that the recovery period from that surgery "usually involves ... a total of 4 to 8 weeks to return to work," and noted "[h]is ability to perform high performance physical work might be questionable." (*Id.*)

On December 22, 2003, Lawrence D. Lieber, M.D., of M&M Orthopedics, Ltd., saw Boland for an "independent medical evaluation" at the request of Gallagher Bassett (which apparently administers United Airlines' workers compensation program). (R. 253.) In a letter dated December 24, 2003, Dr. Lieber reported his conclusions from that examination as well as his review of certain records from Dr. Karaikovic, among others. (R. 253-56.) Dr. Lieber stated that he could "find no objective evidence or any functional impairment of the patient's lower back area that can be directly related to the injury sustained during his employment in August 2003." (*Id.*) Dr. Lieber acknowledged that claimant's lower back showed "significant abnormalities" consistent with a herniated disc, degenerative in nature, but felt that condition was pre-existent. (*Id.*) He concluded claimant could return to work with no restrictions associated with the August 2003 injury, but might require use of a lumbosacral corset or "possibly a functional capacity evaluation to determine his ability to return to a functional work environment." (*Id.*)

4

Apparently after the approval of his insurance provider, claimant scheduled a discectomy with Dr. Karaikovic for August 4, 2004. (*See* R. 179.) On July 16, 2004, Dr. Karaikovic (or someone on his behalf) signed a "Return to Work/School" form stating that Boland was under his care for the treatment of "discectomy" and "is going to unable to work for approximately 4-6 weeks after surgery [sic]." (R. 208.)

On July 14, 2004, claimant had a pre-operative MRI in anticipation of his August discectomy. (R. 196.) However, when Dr. Karaikovic reviewed the MRI on August 11, 2004, he believed that the new test indicated that the herniated disc had shrunk. (R. 181.) Based on this new information, Dr. Karaikovic changed his diagnosis of Boland's back issues from disc herniation to lumbar/lumbosacral disc degeneration, and suggested "postponing the surgery" because he did not believe the discectomy "would help him as much as [the doctor] wanted to." (*Id.*) With this new diagnosis, Dr. Karaikovic opined that the majority of claimant's pain "is mechanical in nature," which meant that he "most likely will need fusion at L4-5," assuming a discography identified the L4-5 i.v. disc as "a pain generator." (*Id.*) Claimant evidently indicated he was interested in having a discography and fusion surgery done, but had to contact his insurance company first for approval. (R. 181.)

On December 17, 2004, Boland had another appointment with Dr. Karaikovic, who noted that Boland "graded his pain 4 on a daily [basis, on a scale of 0 to 10].... [He] cannot sit for more than [a] short period of time. [He] spent his visit standing in the office and constantly tossing and turning." (R. 215.) The doctor noted that claimant takes four to six Vicodin pills daily. (*Id.*) Dr. Karaikovic would not refill the patient's narcotic prescription, noting in his records that "I informed him that I do not prescribe

5

narcotic pain medication expect in a short postoperative period [sic]." (R. 216.) He switched claimant to muscle relaxants. (*Id.*)

Apparently at the requirement of United Airline's workers compensation insurance, Boland saw Dr. Alexander J. Ghanayem, M.D., the Chief of the Division of Spine Surgery at the Loyola University Health System in Chicago, for a second opinion. (R. 224.) Based on his review of the results of a discogram, Dr. Ghanayem wrote a letter dated January 18, 2005, wherein he disagreed with Dr. Karaikovic's recommendation of decompression and fusion surgery. (*Id.*) Instead, Dr. Ghanayem recommended that Boland undergo a functional capacity evaluation and return to work within the strictures of that evaluation's findings. (*Id.*)

On February 8, 2005, a letter from a "nurse case manager working on behalf of United Airlines and Gallagher Bassett" asked Dr. Karaikovic to "Please give 12/17/04 work capabilities, please indicate if patient is able to return to work doing light duty alternate sitting standing work [sic]," and also asked "Have you released this patient to return to (please state date of release) Modified work? Full duty work?" (R. 226.) In response, Dr. Karaikovic wrote on February 10, 2005: "work status: as tolerated." (*Id.*) In March, the nurse case manager wrote Dr. Karaikovic asking him to "please clarify 'as tolerated'. Is patient able to work doing light duty alternate sitting standing work[?]" (R. 223.) It appears that Dr. Karaikovic's office did not respond to that request for clarification.

On March 9, 2005, Boland and Dr. Karaikovic discussed Dr. Ghanayem's opinion that fusion surgery was not indicated for Boland. (R. 178.) Dr. Karaikovic's notes indicate that Dr. Karaikovic disagreed with Dr. Ghanayem's conclusions. (*Id.*) Dr.

6

Karaikovic wrote that Dr. Ghanayem did not see claimant's second MRI and apparently only reviewed the discogram report, and that discograms "are known to be very nonspecific and notorious inaccurate [sic]." (R. 178.) Dr. Karaikovic encouraged claimant to, among other things, request a second visit with Dr. Ghanayem, "who is a fine and very experience surgeon [sic]," or to seek a third doctor's opinion. (*Id.*) No evidence in the record indicates that Boland sought a third surgeon's opinion. Boland later reported to Dr. Karaikovic that his workers' compensation insurance refused to approve the decompression and fusion surgery. (R. 340.)[3]

In April 2005, Boland underwent a functional capacity evaluation ("FCE"). (R. 270-80.) That evaluation was conducted by Susan Ashby, a physical therapist at a HealthSouth office in Carol Stream, Illinois. She concluded that Boland "is currently demonstrating the ability to perform in the 'sedentary' physical demand level as set forth in the material handling section of this report," and wrote that his "major limiting factor was subjective reports of bilateral lumbar paraspinal and right leg pain." (R. 270.) She found that Boland could not meet the requirement that ramp servicemen be able to lift seventy pounds. (*Id.*) She also noted that while "demonstrated consistent effort for validity tests and musculoskeletal screen," his "maximal effort for lifting portion is questionable due to minimal/no elevation in heart rate and blood pressure [sic]." (*Id.*)

About a year later, on April 17, 2006, Robert McGuffin, M.D., of United Airlines' Medical Department, completed a one-page "Assessment of Functional Capabilities"

---

[3] The record does not contain a copy of the insurance company's written denial of claimant's request for that surgery. Defendant notes, and claimant does not dispute, that the record does not show that claimant's insurance denied other coverage. (Df.'s Mem. at 12 [31].)

report regarding claimant. (R. 172.) He concluded that claimant had "long-term functional limitations," and wrote "No lifting more than ten (10) pounds; able to perform light-intensity work only." (*Id.*)

After claimant applied for DIB, the Illinois Bureau of Disability Determination Service ("DDS") sent him for an examination with Raj M. Sajid, M.D., a physician at Schaumburg Immediate Care. On May 29, 2007, Dr. Sajid examined Boland and completed a "Disability Evaluation Report." (R. 298-304.) In that report, Dr. Sajid wrote that claimant "has no anatomic abnormality of cervical, thoracic or lumbar spine. There is no paraspinal muscle spasm," and that as for claimant's gait, claimant can "ambulate without assistance, but with difficult due to pain [sic]." (R. 299.) Dr. Sajid found, among other things, that claimant's ranges of motion in his shoulder, elbow, hip, knee, and ankle were "within normal limits." (R. 300.) He also found that claimant's lumbar spine had flexion of 10 degrees, extension of 10 degrees, and left and right lateral bending of 10 degrees, and noted that claimant "was in severe pain upon performing this range of motion." (*Id.*) Finally, he wrote that claimant "walks 50 feet distance with the stress due to back pain [sic]," and beside the word "Impression" wrote "Severe low back pain." (*Id.*)

On June 8, 2007, medical consultant Richard Bilinsky, M.D., completed a physical residual functional capacity ("RFC") assessment report for Boland. (R. 305-12.) Dr. Bilinsky opined that Boland could frequently lift or carry 10 pounds, occasionally lift or carry 20 pounds, stand and walk with normal breaks for a total of at least two hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. 306.) He also found that claimant's push and/or pull exertional limitations were unlimited, other than as noted for lift and carry. (*Id.*) As

for postural limitations, Dr. Bilinsky indicated Boland was limited "occasionally" in climbing ramps/stairs and ladder/rope/scaffolds, and in balancing, stooping, kneeling, crouching, and crawling. (R. 307.) He also noted that Boland should "avoid concentrated exposure" to vibration and "hazards (machinery, heights, etc.)." (R. 309.)[4]

On June 13, 2007, Dr. Karaikovic's office sent a facsimile to DDS stating that "Dr. Eldin Karaikovic has not seen this patient [Boland] since 12/17/04. Therefore, at this time Dr. Karaikovic is not approving disability for this p[atien]t. Please contact patient's primary care physician. not on file [sic]." (R. 313 - emphases in original.)

After the Commissioner rejected claimant's application for benefits, and after claimant requested reconsideration, DDS obtained another consultative evaluation and another physical RFC report. (R. 314-17; R. 318-25.) On September 24, 2007, Ravikiran N. Tamragouri, M.D., of the Internal Medicine Center in Downers Grove, examined Boland for a "limited consultation regarding back injury." (R. 316.) Dr. Tamragouri noted, among other things, that Boland had a limited range of motion in his spine and his "[g]ait is abnormal as he favors his right knee." (R. 316, 317.) Dr. Tamragouri's "clinical impression" was that Boland had "lumbar spine disc disease with

---

[4] Dr. Bilinsky's report does not explicitly state whether he personally examined Boland, the portion citing "the specific facts upon which [his] conclusions are based" lists findings from a "5/29/07 CE." (R. 306.) As noted above, Dr. Sajid met with claimant on May 29, 2007, and Dr. Sajid's findings included all those set forth in Dr. Bilinsky's report, with two exceptions. First, while Dr. Sajid wrote "Severe low back pain" after "impression," Dr. Bilinsky wrote simply "low back pain." (*Compare* R. 300 *with* R. 305, 307.) Second, Dr. Bilinsky included a reference to claimant's "BMI: 32.2," while Dr. Sajid's report does not calculate BMI but does include claimant's weight and height. (*Compare* R. 299 *with* R. 306.) As a result, we assume – and the parties do not dispute – that Dr. Bilinsky purported to base his RFC assessment on Dr. Sajid's findings as set forth in his Disability Evaluation Report. Additionally, Dr. Bilinsky expressly noted that no treating or examining source statements regarding claimant's physical capacities appeared in the file. (R. 311.)

referred pain over his right leg," "Possible radicular pain based on his symptoms." (R. 317.)

On September 27, 2007, medical consultant Ernst Bone, M.D., completed a physical RFC report regarding claimant. (R. 318-25.) Dr. Bone opined that claimant could frequently lift or carry 10 pounds, occasionally lift or carry 20 pounds, stand and walk with normal breaks for a total of about six hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. 319.) He also found that claimant's push and/or pull exertional limitations were unlimited, other than as shown for lift and carry. (*Id.*) Dr. Bone indicated that claimant was limited "occasionally" in climbing ramps/stairs and ladder/rope/scaffolds, and in balancing, stooping, kneeling, crouching, and crawling. (R. 320.) He also indicated that claimant should "avoid concentrated exposure" to vibration and "hazards (machinery, heights, etc.)." (R. 322.) Where asked to cite "specific facts upon which [his] conclusions are based," Dr. Bone wrote that claimant "is restricted to light work activity due to low back pain." (R. 319; *see also* R. 320.)[5] Finally, he noted that claimant "alleges a disability ... due to mechanical back injury at L4-L5 with degeneration of the right leg and right knee pain. Medical records indicate that individual is restricted to light work activity given the individual's baak pain [sic]." (R. 325.)

---

[5] Dr. Bone's physical RFC assessment, like Dr. Bilinsky's, does not indicate whether or not he personally examined Boland. However, Dr. Bone also does not indicate what medical records he reviewed in connection with his report. (*See* R. 319.) It may be reasonable to infer from the timing of his report that Dr. Bone relied upon Dr. Tamragouri's consultative evaluation as the basis for Dr. Bone's RFC assessment, but that is not explicit in the record. Dr. Bone did note that no treating or examining source statements regarding claimant's physical capacities appeared in the file. (R. 324.)

On April 28, 2008, Boland had his first appointment with Sandeep Gaonkar, M.D., a psychiatrist. (R. 329.) Claimant complained of mood swings, irritability and frustration, low motivation, and poor control of himself. (*Id.*) Dr. Gaonkar initially diagnosed Boland with a mood disorder and back pain. (R. 332.) Over the next year, Boland and Dr. Gaonkar met approximately every two months for medication management. (R. 333; *see also* R. 326-28.) By April 2009, Boland was taking three prescriptions: Xanax, Klonopin, and Depakote. (R. 333.)

Notably, following the disagreement in 2005 between orthopaedic surgeons Karaikovic and Ghanayem regarding the utility of decompression and fusion surgery, Boland had a FCE done but did not return to work. (R. 270-80, R. 340.) Additionally, Boland never had either the discectomy or the fusion surgery. In March 2009, Boland met with Dr. Karaikovic again, evidently "trying to get to have surgery done [sic]." (R. 340.) Boland reported to Dr. Karaikovic that since their last visit, Boland had not worked, had been receiving workers' compensation payments, and had been through physical therapy, water therapy, various oral pain medications, and steroid injections. (R. 338, 340.)[6] Claimant also reported that he experienced "fairly severe" pain, that he could perform self-care but it was painful and difficult, that pain limits his ability to stand, sit, sleep, and walk, and that pain has disrupted his sleep, sex life, and social life. (R. 338-39.) Dr. Karaikovic's "plan" was for another MRI to be taken, for "activity as tolerated," for claimant to be "off work for one week only until the MRI is done," and to follow up within one week of the MRI, "Final recommendations pending." (R. 340.)

---

[6] Our review of the record does not reveal any contemporaneous documentation of such therapies or treatments.

11

On April 10, 2009, psychiatrist Dr. Gaonkar completed a mental RFC questionnaire regarding claimant. (R. 333-37.) In his report, Dr. Gaonkar noted his diagnosis of claimant with mood and bipolar disorders as well as back pain. (R. 333.) Under "prognosis," Dr. Gaonkar wrote "improving with medications." (*Id.*) He found that claimant had "limited but satisfactory" mental abilities and aptitudes for the bulk of those needed for unskilled work, such as understanding and remembering simple instructions, making simple work-related decisions, and performing at a consistent pace. (R. 335.) However, Dr. Gaonkar found that on three such metrics, claimant had "seriously limited but not precluded" abilities for unskilled work, specifically regarding accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and responding appropriately to changes in a routine work setting. (*Id.*)

As for his abilities related to semiskilled and skilled work, as well as particular types of jobs, Dr. Gaonkar found claimant had "limited but satisfactory abilities" or better for everything but dealing with the stress of semiskilled and skilled work, for which he found claimant was "seriously limited, but not precluded." (R. 336.) Dr. Gaonkar noted "drowsiness" and "stomach upset" as medication side effects that might have implications for working, and identified the following additional reasons that claimant would have "difficulty working at a regular job on a sustained basis": "Emotional Lability; Periodic Depression; Easily Distracted; Moderate - Severe - Anxiety." (R. 333, 337.) Finally, he opined that claimant's impairments or treatment would cause him to be absent from work about two days per month, and answered "yes" to the question: "Has your patient's impairment lasted or can it be expected to last at least twelve months?"

12

(*Id.*)  Dr. Gaonkar also indicated that claimant is not a malingerer.  (*Id.*)

### C.    Hearing Testimony

Claimant was represented by counsel at the April 15, 2009 hearing before the
ALJ.  (*E.g.,* R. 12.)  At that hearing, claimant testified that he injured his back unloading
a plane in 2003.  (R. 18.)  He reported that since then, he experienced pain in his back,
right leg, right knee, right hip, and neck, much of which had worsened since the initial
injury.  (R. 20.)  Claimant testified that he could sit, stand, or walk for about 20 to 30
minutes at a time for each, walk half a mile, and lift 10 or 12 pounds.  (R. 21.)  He
testified to taking Klonopin, Xanax, and Depakote as prescribed by his psychiatrist, and
that he takes ibuprofens over-the-counter and lays down "a lot" when the pain is "real
bad."  (R. 21-2.)  He does not use a cane or back brace.  (*Id.*)

Boland testified that at his most recent visit with Dr. Karaikovic, the doctor
wanted him to get another MRI but that claimant had not yet gotten the test because he
was "waiting on approval from the insurance company to have it done."  (R. 23.)

With respect to his activities of daily living, claimant reported that he is able to
take care of himself, mow about half his front yard, make a trip to the store "on a good
day," does "a little bit of walking" for exercise, and attends his sons' high school track
meets when he is physically able to.  (R. 24-25.)  He testified that he could not do any
painting at home or household repairs.  (R. 24.)  Boland also described the changes he
has made to his daily habits to minimize his pain: he takes baths instead of showers,
because standing and bending to wash is painful, lies down periodically during the day
to relieve pain, and uses heating pads and hot baths to relax his back muscles.  (R. 22,
27.)  Claimant testified that he has "bad days" about 10 days of every 30-day month.

13

(R. 26.) A "bad day" is one on which the pain in his back is sufficiently severe that he cannot walk or move up and down stairs. (*Id.*) On such days, he does not leave his house. (*Id.*)

During the hearing, the ALJ also asked claimant about his mental health:

Q: Any other health problems besides the orthopedic problems you've mentioned?
A: No, Your Honor.
Q: All right. When Counsel indicated in her opening statement there was some problem with your mood. Is that –
A: Well –
Q: – something we need to address?
A: Well, I have been seeing a psychiatrist for, I believe a year or maybe a little longer now, because I definitely was – my mental outlook was changing.
Q: All right. Does that limit you in any way?
A: It was until I started seeing Dr. [Gaonkar]. He's been helpful.

(R. 20-21.)

No medical or vocation expert testified at the hearing.

## II.   LEGAL ANALYSIS

### A.   Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means evidence a reasonable person would "accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); see also *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner*

14

*v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm that decision. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). In other words, "the issue before this court is whether the ALJ's findings were supported by substantial evidence, not whether [claimant] is disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

### B.    Analysis Under the Social Security Act

To qualify for disability benefits, a claimant must be found "disabled" under the Social Security Act (the "Act"). 42 U.S.C. § 423(a)(1)(E). A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by

15

reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ must consider the following five-step inquiry: (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the Appendix to the Social Security Regulations as severe enough to preclude gainful employment; (4) whether the claimant's residual functional capacity leaves him unable to perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step process in evaluating Boland's claim. At step one, the ALJ found that Boland has not engaged in any substantial gainful activity since the alleged onset of disability on August 8, 2003. (R. 37.) At step two, he found that claimant has a "severe spinal impairment," and that claimant "also alleged a mental impairment but none is established." (R. 37-38.) At step three, he found that claimant's spinal impairment did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526). (R. 38.) He then found that Boland had the RFC to perform light work, subject to postural limitations

16

against more than occasional balancing, kneeling, stooping, crouching, crawling or climbing, and the environmental need to avoid concentrated exposure to vibrations and hazards. (R. 38.) As for claimant's credibility, the ALJ found that the objective evidence, including a gap in medical treatment, his doctor's release of claimant to return to work approximately 4 to 6 weeks after a discectomy, and the lack of evidence that claimant took prescription medication for pain relief, all failed to support claimant's allegation of a disabling condition. (R. 39.) At step four, the ALJ found that claimant could not perform his previous work as a baggage handler, as that required lifting items over 50 pounds on frequent basis. (R. 40.) At step five, the ALJ found that, considering claimant's age, education, work experience, RFC, and the Medical-Vocational Guidelines, jobs existed in significant numbers in the national economy that he could perform. (R. 40-41.) As a result, the ALJ concluded claimant had not been disabled from August 8, 2003 through the date of his decision. (R. 41.)

Boland argues that the ALJ's decision was not based on substantial evidence, that the ALJ erred in assessing his credibility, that the ALJ erred in determining his RFC, and that the ALJ failed to make an appropriate step five finding.

### C. The ALJ Failed to Appropriately Consider Evidence Regarding Claimant's Mental Limitations.

As noted above, an ALJ must build an accurate and logical bridge from the evidence to his conclusion and must confront the evidence that does not support his conclusion and explain why it was rejected. Here, we hold that the ALJ's conclusion that claimant had not established any mental impairment fails to meet that standard because it rests on material misstatements of the medical record. First, the ALJ

erroneously stated that claimant first sought treatment for mental symptoms in December 2008, citing Dr. Gaonkar's treatment notes.  (R. 38.)  However, the record indicates that claimant first saw Dr. Gaonkar on April 28, 2008.  (R. 329.)  Second, the ALJ stated – without any record citation – that Dr. Gaonkar "opined that … with medication [claimant's] condition may not even last 12 months."  (R. 38.)  However, Dr. Gaonkar's mental RFC report states that claimant's impairment "has lasted or can … be expected to last at least 12 months."  (R. 337.)  Based on the ALJ's misstatements of the medical record, his conclusion that claimant had not established a mental impairment must be reversed and the issue remanded for further consideration.  *See, e.g., Cochrane v. Astrue*, No. 08-2906, 2009 WL 5173496, at **8-9 (N.D. Ill. Dec. 30, 2009) (finding that ALJ's statements that "there was 'no actual diagnosis' of fibromyalgia" and "no objective evidence of carpal tunnel syndrome" warranted remand where the medical reports in the record contain doctors' uncontested diagnoses of fibromyalgia and carpal tunnel syndrome); *Dixon*, 270 F.3d at 1176 (the ALJ "must build an *accurate* and logical bridge from the evidence to her conclusion.") (emphasis supplied).

Additionally, we note that the ALJ's conclusion that claimant has no mental impairment may suggest a lack of understanding of bipolar disorder, and that the ALJ inappropriately failed to discuss evidence contrary to his conclusion.  The ALJ wrote that after claimant was prescribed various medications, "Dr. Gaonkar reported that he improved."  (R. 38.)  However, while Dr. Gaonkar's "prognosis" was that claimant was "improving with medications," and claimant testified that Dr. Gaonkar has been "helpful," Dr. Gaonkar also opined that claimant's mental limitations would cause him to miss

18

work about two days per month, and expressed specific concerns that claimant would have difficulty working at a regular job on a sustained basis.  (R. 337.)  Unfortunately, the ALJ's opinion does not address that evidence, or the fact that claimant was taking three psychotropic medications and reported side effects of drowsiness and upset stomach.  Nor did the ALJ discuss Dr. Gaonkar's opinion that Boland was "seriously limited" in certain abilities – including accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers – required for unskilled work.  (R. 335.)  *Cf.* SSR 85-15, 1985 WL 56857, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) ... to respond appropriately to supervision, coworkers, and usual work situations ....  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.").

As a result, on remand, we direct the ALJ to consider the episodic nature of bipolar disorder and recognize that some periods of improvement are not inconsistent with the disorder.  *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (ALJ erred in relying on hopeful remarks in treating physician's notes and ignoring "chronic" nature of bipolar disorder, where an afflicted person is "likely to have better days and worse days").  We also remind the ALJ of his responsibility to confront evidence that does not support his conclusion and explain why he rejects it.  *Indoranto*, 374 F.3d at 474.

### D.     The ALJ Failed to Appropriately Consider Evidence Regarding Claimant's Credibility.

Because the ALJ is in a superior position to judge the credibility of a claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong." *Powers v. Apfel*,

207 F.3d 431, 435 (7th Cir. 2000) (*quoting Herr v. Sullivan*, 912 F.2d 178, 181 (7th

Cir.1990)). The ALJ's credibility determination is entitled to "special deference." *Scheck*

*v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (*citing Powers*, 207 F.3d at 435).

However, the ALJ is still required to articulate his reasoning and discuss or distinguish

relevant contrary evidence. *Clifford*, 227 F.3d at 870. "Thus, although the ALJ need not

discuss every piece of evidence in the record, the ALJ may not ignore an entire line of

evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to

tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski v.*

*Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted). The ALJ must also

follow the requirements of Social Security Ruling ("SSR") 96-7p. *Brindisi v. Barnhart*,

315 F.3d 783, 787 (7th Cir. 2003). Among other things, SSR 96-7p requires ALJs to

consider the entire case record when evaluating an individual's credibility. 1996 WL

374186, at *4.

Here, we conclude the ALJ's determination regarding Boland's credibility was

flawed in multiple respects. First, the ALJ did not appropriately evaluate claimant's

credibility before assessing his RFC. Instead, the ALJ conclusorily wrote that claimant's

statements regarding his symptoms were not credible to the extent that they were

inconsistent with the ALJ's RFC determination. (R. 39.) There is no explanation of

which of Boland's statements are not entirely credible or how credible or noncredible

any of them are. Such a perfunctory analysis fails to comply with Seventh Circuit

precedent. *E.g., Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Brindisi*, 315

F.3d at 787-88.

Next, the ALJ materially misstated the medical record when he noted that

20

claimant underwent a discectomy in July 2004 and that his doctor released him to return to work approximately 4 to 6 weeks thereafter. (R. 39; *see also* R. 40.)[7] In fact, Boland never had the discectomy or any other surgery. While that fact could arguably cut both for and against Boland's claim, the ALJ's failure to accurately assess fundamental evidence regarding claimant's treatment history warrants remand. *See Cochrane*, 2009 WL 5173496, at **8-9; *Dixon*, 270 F.3d at 1176.

Third, the ALJ's credibility determination relied in part on a gap in claimant's medical treatment (which the ALJ indicated ran from late 2004 through March 2009[8]), as well as his failure to take prescription medication for pain relief. (R. 39.) However, SSR 96-7p precludes an adjudicator from drawing any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." 1996 WL 374186, at *7; *accord Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Here, the ALJ failed to probe at the hearing any reasons for the gap in claimant's medical care or the absence of prescription pain medication. Further, the ALJ failed to appropriately discuss record evidence that may explain those issues. For example, notes from a December 17, 2004 visit with Dr.

---

[7] As support, the ALJ cites the "Return to Work/School" form completed by Dr. Karaikovic's office on July 16, 2004. (R. 208.) However, as is clear from the record, as well as the parties' briefs before this Court, that form was completed prior to the then-scheduled discectomy, evidently in anticipation of Boland's approximate recovery period.

[8] While not material to our decision, we note that the record indicates the gap may be a bit shorter than acknowledged by the ALJ. Among other things, the record contains notes from Dr. Karaikovic dated March 2005 (R. 178), although it elsewhere indicates that Dr. Karaikovic had not seen claimant since December 2004. (R. 313.)

Karaikovic indicate that he advised claimant he does not prescribe narcotic pain medication except in a short post-operative period. (R. 216.) While one section of ALJ's opinion (on "Testimony") acknowledged that Boland "was on Vicodin for pain but stopped after his doctor became fearful of addiction" (R. 37), the ALJ failed to account for that evidence in connection with his credibility determination.

Finally, the ALJ failed to adequately justify his reliance on Boland's activities of daily living – such as making his children's lunches and running errands – in concluding that those activities were "commensurate with a light level of exertion." (R. 40.) For example, while the ALJ noted Boland's testimony that he lies down two to three times a day on the days he accomplishes those tasks. (*Id.*). However, the ALJ failed to discuss how such breaks could be consistent with workplace demands. *See Carradine v. Barnhardt*, 360 F.3d 751, 755-56 (ALJ improperly "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week."); *Gentle v. Barnhardt*, 430 F.3d 865, 867 (7th Cir. 2005) (ALJ's "casual equating of household work to work in the labor market" could not stand because, among other things, taking care of an infant "has a degree of flexibility that work in the workplace does not."). Relatedly, the ALJ also ignored Boland's testimony that he could conduct those activities "on a good day," and that approximately 10 of every 30 days were "bad days" where he cannot leave the house, walk, or make it up or down stairs because of the pain. (R. 24-26.) The ALJ's failure to address that contrary evidence warrants remand. *Clifford*, 227 F.3d at 870.[9]

---

[9] Claimant also argues that the ALJ improperly failed to reconcile his testimony regarding his ability to stand and walk only 20 to 30 minutes each, and his ability to lift 10 to 12 pounds at

### E.    The ALJ's RFC Assessment is Deficient.

A claimant's RFC must be based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family.  20 C.F.R. § 404.1545(a)(3).  In making that determination, the ALJ must decide which treating and examining doctors' opinions should receive weight, and explain the reasons for that finding.  20 C.F.R. § 404.1527(d), (f).  Additionally, the ALJ's RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions.  SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, as stated above, the ALJ concluded that Boland had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), subject to postural limitations against more than occasional balancing, kneeling, stooping, crouching, crawling or climbing, and the environmental need to avoid concentrated exposure to vibrations and hazards. (R. 38.)  The Code of Federal Regulations defines "light work" as that involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category

---

most.  (Pl.'s Mem. at 13 [17-1].)  However, claimant's brief only cursorily addresses the issue, is inconsistent as to whether he contends that evidence should have been addressed in connection with the ALJ's credibility determination or his RFC determination, and does not cite analogous cases.  (*Cf.* Pl.'s Mem. at 12 *with id.* at 13.)  As a result, we decline to hold that the ALJ's failure in this regard independently warrants remand.  Instead, we respectfully direct the ALJ to address this testimony as appropriate on remand.  *See, e.g.*, SSR 96-7p, 1996 WL 374186, at *4 ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including ... the individual's own statements about symptoms .... An individual's statements ... about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."); SSR 96-8p, 1996 WL 374184, at *7 (In determining the RFC, "[t]he adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

The ALJ's RFC determination warrants remand for several reasons. First, the ALJ failed altogether to address evidence contrary to his conclusion. For example, Ms. Ashby's April 2005 FCE concluded Boland could perform in the "'sedentary' physical demand level as set forth in the material handling section of [her] report," and Dr. McGuffin's April 2006 report stated claimant should not lift more than ten pounds. (R. 270, 172.) *See also* 20 C.F.R. § 404.1567(a) (defining "Sedentary work" as that involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools .... Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."). Further, Dr. Karaikovic stated claimant could work and perform activity "as tolerated." (R. 228, 340. The ALJ's failure to address that contrary evidence or to explain why he rejected it warrants remand. *E.g.*, SSR 96-8p, 1996 WL 374184, at *7 ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved .... If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *Indoranto*, 374 F.3d at 474 (the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected.").[10]

---

[10] Given our other rulings herein, on remand, the ALJ may also need to specifically address the mental RFC assessment of claimant's psychiatrist Dr. Gaonkar in the context of his RFC

Second, contrary to SSR 96-8p, the ALJ did not sufficiently explain how he arrived at his conclusion that Boland could perform light work, subject to certain postural and environmental limitations. SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts"). Most glaringly, the ALJ failed to cite any medical source opinions in support of his RFC determination. While he wrote that he "also considered opinion evidence," that conclusory statement is utterly insufficient to meet the requirements of SSR 96-8p.

Both parties acknowledge that ALJ's RFC is consistent with those of the DDS consultants Drs. Bilinsky and Bone, although claimant argues it would have been inappropriate for the ALJ to rely on those reports, and defendant asserts otherwise. (*E.g.,* Pl.'s Mem. at 11; Df.'s Mem. at 7-9; Pl.'s Reply at 2-5 [32].) The parties' arguments on those points miss the mark. This Court will not determine whether an ALJ properly weighed evidence based on post-hoc inferences and arguments regarding evidence he may have used in reaching his conclusions. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("[T]he fact that the [ALJ], had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion."). The ALJ failed to articulate the medical opinions on which he

---

determination. *See, e.g.*, *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008) ("When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'") (*citing* 20 C.F.R. § 404.1545(a)(2), (b), (c)); SSR 96-8p, 1996 WL 374184, at *7 (If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

relied.  In light of the requirements of SSR 96-8p, we cannot find that error to be

harmless.[11]  As a result, remand for further proceedings is warranted.

Third,  as support for his RFC determination, the ALJ relied on Dr. Karaikovic

releasing Boland to return to work after his discectomy.  (R. 39, 40.)  However, as

discussed above, Boland never had surgery.  In fact, Dr. Karaikovic's last word on the

issue in March 2009 was that Boland could conduct "activity as tolerated," and that Dr.

Karaikovic's "[f]inal recommendations [were] pending" completion of a MRI of Boland's

lower spine.  (R. 340.)  Again, while we express no opinion as to implications of the lack

of surgery on Boland's claim, the ALJ's misstatement of the record renders his RFC

determination deficient and requires remand.

**F.     The ALJ's Step Five Determination is Not Supported by Substantial Evidence.**

Here, after finding that Boland had the RFC to perform light work, subject to

certain postural and environmental limitations, the ALJ applied the Medical-Vocational

Guidelines (the "Grids").  (R. 40-41.)  According to the ALJ, the Grids directed a finding

of "not disabled" for a person of Boland's age, education, and work experience who is

capable of performing a full range of light work.  (*Id.*)  With respect to the postural and

environmental limitations he found, the ALJ wrote that "they are not such that they

would compromise the extensive occupational base otherwise available."  (R. 40-41.)

According to the Seventh Circuit, "if a claimant suffers from both exertional *and*

*nonexertional* limitations, the ALJ *must* consult a V[ocational] E[xpert] to establish

---

[11]  For the same reasons, we will not address the parties' arguments regarding the merits of the evidence allegedly supporting and contradicting the ALJ's RFC, or whether the ALJ properly weighed the medical opinions in the record.

whether a significant number of jobs exist allowing for both types of limitations."

*Lawrence v. Astrue,* 2009 WL 2178670 , No. 08-3527, 337 Fex. Appx. 579, 585 (7th Cir. Jul 27, 2009) (emphases added) (*citing, inter alia,* 20 C.F.R. pt. 404, supbt. P, App. 2 § 200.00(e); *Villano v. Astrue*, 556 F.3d 558, 564 (7th Cir. 2009)).  Here, each of the postural and environmental limitations on light work imposed by the ALJ was nonexertional in nature.  SSR 85-15, 1985 WL 56857, at **3, 6-8 (listing, among other "Examples of Nonexertional Impairments," "climbing and balancing," "Stooping, kneeling, crouching, and crawling," and "environmental restrictions" such as those "involving extremes of ... vibration" and "recognized hazards").  However, no vocational expert testified at the hearing before the ALJ, and the ALJ did not cite any vocational materials or other evidence establishing that the nonexertional limitations he found were not substantial.  As a result, the ALJ's reliance on the Grids at step five is not supported by substantial evidence, and remand is warranted.  *Lawrence*, 337 Fed. Appx. at 585.

Finally, as discussed above, we are remanding because, among other things, the ALJ failed to appropriately consider evidence regarding claimant's mental limitations, as well as evidence contradicting the ALJ's RFC determination.  As a result, on remand, we respectfully remind the ALJ that, should he conclude that claimant has mental impairments, or find the evidence limiting claimant to sedentary work to be persuasive, he should take those findings into account at step five as well.  *See, e.g.,* SSR 83-11, 1983 WL 31252, at *2 ("The RFC upon which each table rule is based reflects the absence of any nonexertional limitation."); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e) ("Since the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they

27

may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments."); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.12 (once a claimant found capable of performing only sedentary work attains age 50, the Medical-Vocational Guidelines direct the ALJ to find the claimant disabled).

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment [17] is granted in part and denied in part, and the Commissioner's motion for summary judgment [30] is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: November 10, 2011

28